IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

APR 2 9 2008

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

DIANE MARIE CAMPBELL,

    Plaintiff,

*vs.*

                         Civil Action No. 3:06cv64
                         (Judge John Preston Bailey)

MICHAEL J. ASTRUE
Commissioner of Social Security,

    Defendant.

## REPORT AND RECOMMENDATION/OPINION

Diane Marie Campbell brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant"

and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and

Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security

Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions

for summary judgment and has been referred to the undersigned United States Magistrate Judge for

submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B);

Fed. R. Civ. P. 72(b); L.R. Gen. P. 83.12.

## I. Procedural History

Diane Marie Campbell ("Plaintiff") filed applications for SSI and DIB on August 5, 2002,

alleging disability since February 1, 1996, due to sleeplessness, seizures, hypertension, panic

disorder, anxiety, high neck and back muscle spasms, and sinus tachycardia (R. 84-86, 117, 532-34).[1]

---

[1]Plaintiff had filed prior SSI and DIB applications on December 3, 1998, due to fainting, hypertension, anxiety, removal of right ovary, broken wrist, shoulder pain, arm pain, neck pain, panic disorder, heart palpitations, stress, and seizure disorder (R. 81-83, 94, 530). Plaintiff's applications were denied initially and upon reconsideration (R. 39). The record does not contain

The state agency denied Plaintiff's applications initially and on reconsideration (R. 40, 41, 541). Plaintiff requested a hearing, which Administrative Law Judge David G. Hatfield ("ALJ") held on March 9, 2005, in Pittsburgh, Pennsylvania, and at which Plaintiff, a witness on her behalf, and Mary Beth Kopar, a vocational expert ("VE") testified (R. 545-89).[2] On April 11, 2005, the ALJ entered a decision finding Plaintiff was not disabled because she could perform the full range of medium work (R. 19-29). Plaintiff filed a Request for Review of Hearing/Decision on May 26, 2005 (R. 14). On April 25, 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 9-11).

## II. Statement of Facts

Plaintiff was born on May 5, 1964, and was forty years old at the time of the administrative hearing in the instant case. Plaintiff obtained her GED in May, 1987. She was awarded a two-year college degree and earned an EMT certification in 1989 (R.123). Her past work included that of registered nurse, cleaner at a restaurant, housekeeper at apartments, caregiver to an elderly family member, and self-employed as craftsperson, making and selling leather purses and necklaces privately, through special orders, and at craft shows (R. 131, 560, 555).

---

any documentation relative to Plaintiff's prior application as to the following: request for reconsideration after the initial and subsequent denial; hearing conducted by an ALJ; an ALJ's decision; any Appeals Council's ruling as to any existing ALJ's decision; or a District Court's ruling as to the final decision of the Commissioner, if any existed.

[2]ALJ Hatfield stated, at the beginning of the March 9, 2005, hearing, that he had convened a hearing on Plaintiff's applications for SSI and DIB in June, 2005, and had postponed it to allow Plaintiff the opportunity to retain counsel (R. 67). Plaintiff informed the ALJ that she had obtained the services of a lawyer to assist her in assembling the evidence and that she felt comfortable proceeding with the hearing without the representation of counsel (R. 547-49). The ALJ observed Plaintiff had "done a bang-up job getting the . . . evidence together," which he admitted at the March 9, 2005 hearing (R. 549).

Plaintiff was treated by Joseph Endrich, M.D., beginning in 1996, for severe intermittent headaches and fainting (R. 230). Plaintiff's examinations were normal on February 1, 1996; February 7, 1996; and February 22, 1996 (R. 229-30). Plaintiff complained of neck tightness on May 21, 1996. Dr. Endrich prescribed Ativan and Flexeril (R. 239).

On December 5, 1996, Dr. Endrich prescribed Zestril for Plaintiff's hypertension. On January 9, 1997, Dr. Endrich prescribed Lisinopril; Plaintiff's examination was unremarkable (R. 228).

On March 19, 1997, Plaintiff reported to Dr. Endrich that she had experienced "bad headaches" and "fainting episodes." Plaintiff had pain at the right rib cage area. Dr. Endrich opined that Plaintiff's headaches were caused by her coughing due to her smoking three packages of cigarettes per day (R. 227).

Plaintiff's examination by Dr. Endrich was normal on July 10, 1997 (R. 226). Dr. Endrich prescribed Ativan and bed rest for her headaches on December 18, 1997. Her examinations that date was normal (R. 224).

Plaintiff presented to Weirton Medical Center's emergency department on March 9, 1998, with complaints of right wrist, right elbow, right hand, and bilateral foot pain. Plaintiff's neurovascular examination was unremarkable. She was provided a sling, prescribed Lortab, instructed to apply ice to the painful areas, and was referred to Dr. Kumar Amin (R. 205).

Plaintiff informed Dr. Amin that she had hurt her wrist when she had engaged in an altercation with police on March 8, 1998, and while she was drinking alcohol. Plaintiff stated she injured her arm when the police officer handcuffed her and "through" her to the ground. Dr. Amin found Plaintiff had a nondisplaced ulnar styloid fracture; he put a cast on Plaintiff's arm for three to four weeks (R. 206).

On March 19, 1998, Plaintiff presented to Gary A. Hanson, M.D., with complaints of hypertension and anxiety. Plaintiff reported she smoked one package of cigarettes per day. Her examinations were normal. Dr. Hanson diagnosed well controlled hypertension, anxiety with possible panic disorder, and tachycardia that was probably related to panic attacks. He instructed Plaintiff to wear a Holter monitor (R. 221).

Plaintiff's Holter monitor did not show "relative tachycardia" when it was read on April 13, 1998. Plaintiff reported feeling "quite a bit better" and stated Ativan and Paxil helped (R. 221, 503).

On July 7, 1998, Plaintiff reported to Dr. Hanson that she had not had any more seizures and that she had not consumed any alcohol since her last seizure. Plaintiff was diagnosed with seizure disorder, "possibly related to alcohol abuse," headaches, and anxiety disorder. She was prescribed Darvocet and instructed not to consume alcohol (R. 219).

Plaintiff presented to Weirton Medical Center's emergency department on July 24, 1998. Plaintiff reported having had a grand mal seizure. She stated she had drunk "heavily" that past Saturday and then had "'several beers'" since then. Plaintiff stated she had had one grand mal seizure eight years earlier. Plaintiff was alert and oriented. All of Plaintiff's examinations produced normal results. Plaintiff's lab work, CT scan of her head, and electrocardiogram were normal. Plaintiff was diagnosed with seizure, "possibly secondary to alcohol withdrawal" (R. 209).

On August 31, 1998, Plaintiff presented to Dr. Hanson with complaints of headaches. She reported she had hit her head during her last seizure. Dr. Hanson found no tenderness in Plaintiff's neck (R. 219).

On November 19, 1998, Dr. Hanson noted Plaintiff was doing "quite a bit better with less pain in her neck" and that she'd had no further seizures. Plaintiff reported she was being treated by

4

a chiropractor for her shoulder pain. She stated she had tingling in her hands. Plaintiff reported drinking up to two beers at a time, but not every day (R. 218-19).

On January 28, 1999, Plaintiff underwent a nerve conduction study and an electromyogram (R. 240). The results were for normal studies in upper limbs. There was "no evidence of median or ulnar nerve entrapment" (R. 241).

On February 9, 1999, Fulvio R. Franyutti, M.D., completed a Residual Physical Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry up to fifty pounds, frequently lift and/or carry up to twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 243). Dr. Franyutti found Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl (R. 244). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 245-46). Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold (R. 246). Dr. Franyutti found there was "no objective evidence supporting disability" and Plaintiff was "not disabled & is able to perform work (R. 247).

Plaintiff underwent chiropractic care at the Weirton Chiropractic Clinic from July, 1997, to February, 1999 (R. 251-52).

Frank B. Eibl, M.A., completed an Adult Mental Profile of Plaintiff on February 25, 1999. Plaintiff reported she had experienced seizures since 1998 and that she had experienced grand mal seizures several times per month since their onset. Plaintiff stated she had back, neck, and arm "problems," for which she was treated by a chiropractor once or twice per year. Plaintiff stated she

had hypertension and daily headaches. Plaintiff stated she had difficulty with standing, sitting, or walking for prolonged periods of time; was limited in her bending, stooping, and lifting; experienced dizziness; dropped objects occasionally; and had difficulty in gripping and grasping (R. 256).

Plaintiff reported feelings of paranoia when in "strange situations"; racing thoughts; panic-like symptoms in the form of hyperventilation, chest pain, difficulty breathing, a smothering sensation, becoming fearful, and feeling unable to escape. These symptoms occurred weekly. Plaintiff reported becoming easily upset, anxious, tense, frustrated, moody, and irritable. Plaintiff reported difficulty in coping and making daily decisions. Plaintiff stated she experienced "some feelings of depression," which could have been due to "marital difficulties" (R. 256). Plaintiff had low morale, had low energy, became tired quickly, cried frequently, experienced attention and concentration difficulties, and was easily distracted. Plaintiff reported no feelings of uselessness or worthlessness and she was able to maintain interest in pleasurable activities. Plaintiff stated she had "'good'" feelings about herself; her home life was "'quiet and peaceful.'" Plaintiff reported she smoked one package of cigarettes per day and had no history of alcohol or substance abuse (R. 257).

Plaintiff listed her activities of daily living as follows: rose between 7:00 a.m. and 8:00 a.m., ate breakfast, did dishes, fed dogs, did some chores, bathed, ate lunch, visited with friend, watched television, took nap occasionally, ate dinner, watched television, occasionally sewed, and retired between 9:00 p.m. and 10:00 p.m. Plaintiff reported she occasionally cooked; did laundry once monthly; did limited household chores; did not drive but used public transportation without assistance; shopped occasionally; occasionally visited others; and managed finances (R. 259).

Mr. Eibl noted Plaintiff was fairly alert, adequately cooperative, and oriented in all spheres. Her affect was flat, her insight was fair, and her reasoning and judgment were fair. Plaintiff's verbal IQ was 87; Performance IQ was 87; Full Scale IQ was 85. Plaintiff's subjective symptoms were

listed as Plaintiff's "seeking disability benefits due to her continued medical and psychological related difficulties." Mr. Eibl's objective findings were for "no psychotic manifestations" and that Plaintiff was "somewhat depressed" (R. 258). Plaintiff's concentration and attention were fair (R. 259). Mr. Eibl's diagnoses were: Axis I – adjustment disorder; mixed anxiety and depressed mood; panic disorder, without agoraphobia; Axis II – no diagnosis; Axis III – reported history of seizure disorder; hypertension; and neck, back, and arm difficulties (R. 259).

Joseph Kuzman, Ed.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff on March 22, 1999. He found Plaintiff had no evidence of limitations in her ability to understand and remember. Mr. Kuzman found Plaintiff had no limitation in her ability to carry out very short and simple instructions; ability to sustain an ordinary routine without special supervision; ability to make simple work-related decisions; ability to ask simple questions or request assistance; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; or ability to be aware of normal hazards and take appropriate precautions. Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Mr. Kuzman found Plaintiff was not significantly limited in her ability to carry out detailed instructions; ability to work in coordination with or proximity to others without being distracted by them; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral

extremes; ability to respond appropriately to changes in the work setting; ability to travel in unfamiliar places or use public transportation; or ability to set realistic goals or make plans independently of others (R. 261-62).

Mr. Kuzman also completed a Psychiatric Review Technique of Plaintiff on March 22, 1999. He found Plaintiff had an anxiety related disorder, in the form of panic and adjustment disorders, and a substance addiction disorder, in the form of alcohol abuse (R. 265, 269, 271). Mr. Kuzman found Plaintiff had slight restrictions of activities of daily living and difficulties in maintaining social functioning. Plaintiff often had deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (R. 272).

On March 15, 2000, Plaintiff reported to Dr. Hanson that she was feeling "the best that she has felt both mentally & physically & ha[d] actually started to taper herself off of Dilantin." Plaintiff stated her headaches were "much less than they used to be." Plaintiff reported using Ativan and Vicodin. Her examination by Dr. Hanson was normal. He encouraged Plaintiff to lose weight and to exercise. Dr. Hanson prescribed Zestoretic (R. 402).

On March 28, 2001, Plaintiff reported to Dr. Hanson that she had "lot of headaches" (R. 402).

On April 25, 2001, after an arrest and conviction for driving under the influence, Plaintiff began treatment for substance abuse at HealthWays (R. 312-51). Plaintiff attended and participated in group therapy sessions on May 1, 2001; May 10, 2001; May 24, 2001; May 31, 2001; June 7, 2001; June 14, 2001; and July 5, 2001 (R. 274-311). Plaintiff was discharged form care at HealthWays on July 26, 2001. The Discharge Summary read that Plaintiff had attended DUI classes and twelve AA meetings during her treatment at HealthWays (R. 274).

On October 11, 2002, Mark Wilson, M.D., completed a Disability Determination Evaluation

of Plaintiff. Plaintiff stated her "current problems" were headaches, sleepiness, seizures, hypertension, anxiety, panic disorder, neck and upper back muscle spasms, chest discomfort and hyperventilation with anxiety, sinus tachycardia, dizziness, weakness, and numbness in the arms and hands. Plaintiff listed her medications as Vicodin, Dilantin, Zestoretic, Xanax, and Duradrin. Plaintiff stated she smoked four to five cigarettes per day and did not consume alcohol (R. 361).

Dr. Wilson's examinations of Plaintiff's HEENT, neck, heart, lungs, extremities, and abdomen were normal (R. 361-62). Plaintiff's neurological examination revealed "an anxious woman who was tearful throughout much of the evaluation." Plaintiff was alert and oriented; her motor exam revealed 5/5 strength throughout; her cranial nerves were intact; her reflexes were normal; her ankle clonus, plantar responses, position sense, vibratory sense, coordination, rapid alternating movements, Romberg, gait, and sensation were intact. An EKG was normal (R. 362).

Dr. Wilson's impressions were as follows: headaches of uncertain etiology, but possibly muscular in nature due to her "neck problem"; seizures; dizziness, faintness, and weakness; history of hypertension; history of anxiety and panic disorder; neck and upper back muscle spasm, with no radiculopathy; and history of chest discomfort with panic attacks (R. 362).

Dr. Wilson found Plaintiff could sit, stand and walk without any limitations. Plaintiff could lift and carry, but with difficulty when she had neck and back pain and headaches. Plaintiff had "good use of both of her hands" and would be able to handle objects (R. 363).

Celeste Sanders, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on October 16, 2002. She noted it was a "Current Evaluation" (R. 384). Dr. Sanders found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hour in an eight-hour

workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 385). Dr. Sanders found Plaintiff had no postural, manipulative, visual, or communicative limitations (R. 386-88). Plaintiff was unlimited in her exposure to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation, but should avoid even moderate exposure to hazards (R. 388).

Also on October 16, 2002, Dr. Sanders completed a Physical Residual Functional Capacity Assessment of Plaintiff for her date last insured, which was December 31, 1997 (R. 392). She found Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations (R. 393-96).

On October 22, 2002, Robert Marinelli, a state-agency physician, completed a Psychiatric Review Technique of Plaintiff. He found she had an impairment, which was not severe; specifically anxiety related disorders in the form of panic disorder (R. 369, 374). Dr. Marinelli found Plaintiff had mild limitations of her activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace (R. 379).

On February 21, 2003, Hugh M. Brown, M.D., a state-agency physician, reviewed and affirmed the findings made by Dr. Sanders in both of her October 16, 2002, Physical Residual Functional Capacity Assessments (R. 391, 399).

On March 4, 2003, Plaintiff presented to Dr. Hanson with complaints of long-time radicular symptoms with her left arm. Plaintiff reported she had not experienced any more seizures and had not drunk alcohol. She stated that Paxil had been "helping but she would like to take a little bit more." Plaintiff had good reflexes in her arms; she had no muscle atrophy or weakness. Dr. Hanson diagnosed cervical radiculopathy and chronic neck and back pain, increased Plaintiff's Paxil and

ordered a MRI of Plaintiff's neck (R. 401).

On March 17, 2003, Plaintiff had a x-ray made of her neck. It revealed encroachment of the C4-5 posterior foramina in the right oblique view. Spurring and encroachment of the C6-7 foramina were more prominently seen in the left oblique view but to a slightly lesser degree. The rest of the foramina were intact and the vertebral bodies showed no compression (R. 405).

A MRI was taken of Plaintiff's brain on March 17, 2003. It was negative (R. 406, 514).

Also on March 17, 2003, a MRI was taken of Plaintiff's cervical spine (R. 406, 514). The impression was for "C3-4: right neural foraminal narrowing contributed by the uncovertebral and facet hypertrophy"; "C6-7: bilateral neural foraminal narrowing contributed by uncovertebral hypertrophy and broad-based posterior spur" and no disc protrusions (R. 407).

On March 18, 2003, Plaintiff underwent a consultative psychological examination by Anthony Golas, Ph.D., upon referral by the West Virginia Department of Education and the Arts Disability Determination Section. Plaintiff drove herself to the evaluation, for which she was the chief source of information (R. 410).

She weighed 180 pounds; her test-taking attitude was good; she was pleasant and cooperative; she moved freely, but had difficulty rising from her chair; she complained of numbness in her right hand when writing; and she wore magnifying glasses when doing craft work (R. 410).

Plaintiff's presenting symptoms were "'headaches, dizziness, high blood pressure, seizures, increased back pain and muscle spasms with numbness of arms and hands occurring with pain, anxiety and depression unknown etiology, gynecological treatment needed, neurological treatment needed.'" Plaintiff reported to Dr. Golas that she attended, but did not complete, the alcohol rehabilitation treatment program at HealthWays in 1991; she had been treated by Dr. Endrich for

anxiety and panic disorder in 1997; she had been treated by Dr. Hanson for anxiety, panic disorder, and depression from 1998 to present (R. 411).

Plaintiff reported she had been treated by a "variety of physicians for" headaches, insomnia, seizures, hypertension, panic disorder, anxiety, neck and back spasms, sinus tachycardia, and dizziness (R. 411-12). Plaintiff reported she began to have severe anxiety, "'passing out, could not drive and/or function daily'" in 1997, and that is when she could no longer work (R. 411). She stated he had had an automobile accident in 1998, during which she had suffered a "'fractured skull, broken arm, and injured back." Plaintiff reported medicating with Dilantin, Vicodin, Xanax, Duradrin, Zestoretic, Flexeril, and Paxil, which "helped somewhat during the past two years" (R. 412).

Plaintiff reported she had not abused alcohol since her 1998 automobile accident and had been sober for the past two years. Plaintiff stated she had been placed in regular classes in school; had earned her GED; had graduated from WV Northern Community College with an A.A. in nursing, which had qualified her for her registered nurse's license and EMT certification (R. 412).

Plaintiff reported her activities of daily living as follows: awoke with back pain; attempted to "motivate" herself for one to two hours; cleaned and "[got] moving"; "tried to work for two or four hours every day"; lay down "'off and on' due to pain and anxiety"; slept three to four hours nightly; bathed daily; cleaned one to two hours daily; sewed or worked on her crafts daily; did laundry daily; "'rarely'" shopped; drove two or three times per week; walked daily in the house; hunted occasionally (R. 417).

Dr. Golas' mental status examination of Plaintiff revealed the following: normal social behavior; normal speech; oriented to time, place, person, situation; mood anxious and moderately depressed; affect broad and appropriate to mood; normal thought process and content; normal

perception; good insight; average judgment; no suicidal/homicidal ideations; normal immediate, recent, and remote memories; and normal concentration. Her psychomotor behavior showed difficulty rising from chair and complaints of numbness of and pain in right hand and arm during writing, but normal posture and gait (R. 413-14, 418).

On the WAIS-III, Plaintiff scored the following: Verbal IQ was 91; Performance IQ was 94; Full Scale IQ was 91 (R. 415). On the WRAT3, Plaintiff scored the following: reading was 98 (high school); spelling was 100 (high school); arithmetic was 90 (eighth grade) (R. 416). On the Beck Depression Inventory, Plaintiff's score was for moderate depression. On the Burns Anxiety Inventory, Plaintiff's score placed her in the extreme anxiety category. Dr. Golas found the following: Axis I – generalized anxiety disorder, with panic attacks, and symptoms of major depression; Axis II – diagnosis deferred; Axis III – seizures, hypertension, neck and back spasms, tachycardia by self report. Dr. Golas found Plaintiff's prognosis was fair (R. 417). Dr. Golas found Plaintiff's social functioning, concentration, persistence, and pace were normal and that Plaintiff could manage her finances (R. 418-19).

On April 2, 2003, Samuel Goots, Ph.D., completed a Psychiatric Review Technique of Plaintiff for a period from July 8, 2002, through April 2, 2003 (R. 420). He found she had an impairment, specifically, generalized anxiety-related disorder with panic attack, which was not severe (R. 420, 425). Dr. Goots found Plaintiff had no restrictions of activities of daily living, mild difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence, or pace (R. 430).

Evidence Presented at the Administrative Hearing

On July 24, 1998, a CT scan was taken of Plaintiff's head for a possible intra cranial

abnormality. The impression was "negative" (R. 517).

On June 8, 1999, Dr. J. Yurigan noted Plaintiff injured her neck and right posterior shoulder when she fell into a pile of wood at home. He found Plaintiff had cervical and thoracic wedging. He instructed Plaintiff to return in two weeks. He opined Plaintiff's prognosis was guarded (R. 494). He ordered conservative treatment (R. 495).

On September 23, 1999, Sudhir Malik, M.D., conducted a neurological consultation of Plaintiff upon referral from Dr. Hanson. Plaintiff informed Dr. Malik that she had had a seizure seven years earlier, which she thought was an allergic reaction to Ceclor. Her next seizure occurred in June, 1998, and was a primary generalized tonic clonic seizure. Plaintiff stated she then had "recurrent seizures approximately once a month for six months and then after two months," her last seizure being in May, 1999. Plaintiff's CT scan and EMG were normal (R. 489).

Plaintiff reported she smoked one package of cigarettes per day and drank alcohol once weekly. Plaintiff's neurological examination and mental status examination were normal. She was oriented, times three. Her speech was clear; her judgment and insight were fair; she had no hallucinations or delusions; she was not agitated; her cranial nerves were normal. Plaintiff's proximal and distal muscle mass, tone and strength were normal in upper and lower extremities; rapid alternating movements and finger-to-nose testing were normal; stance and gait were normal; Romberg's test was negative; and sensory examination to touch was symmetric. Plaintiff was able to stand on tiptoe and heel and able to walk heel to toe (R. 490).

Dr. Malik's impression was for "questionable history of new onset of seizures in June of 1998 with recurrence, the last one occurring in May of 1999." Etiology of seizures was unclear and neurological examination was unrevealing (R. 490). Dr. Malik "suggest[ed]" Plaintiff undergo an

EEG and MRI and increase her dosage of Dilantin (R. 491).

On January 19, 2003, Plaintiff presented to Dr. Hanson with ear pain. She stated she "tried to do several jobs which were relatively easy physically but could not do them because of back & neck pain." Dr. Hanson found Plaintiff "remain[ed] partially disabled" and instructed her to return in three months. He diagnosed chronic neck pain. (R. 498).

On February 16, 2003, Plaintiff reported to Dr. Hanson that she was "doing ok" generally, "although she still [had] significant panic problems as well as neck pain." She stated she had not had any seizures, had not been consuming alcohol, had not been smoking very much. Dr. Hanson's examination of Plaintiff's chest and abdomen revealed normal results. He diagnosed chronic neck pain (R. 498).

On March 23, 2003, Plaintiff reported to Health Care Center that her father had died, she was attempting to cease smoking, she could not attend her father's funeral, and she had to visit a friend in the hospital. The family nurse practitioner found Plaintiff experienced many stressors, anxiety and situational depression. Plaintiff was prescribed Paxil (R. 526).

On July 10, 2003, Plaintiff reported to the family nurse practitioner at Health Care Center that she had been experiencing a lot of headaches, which caused her to miss two weeks out of four from her job, which caused her to lose her job. Her best friend had died. Her sleep was disturbed. She had been smoking one-half package of cigarettes per day (R. 527).

On July 16, 2003, Plaintiff reported to Dr. Hanson she had stopped smoking two months earlier, she had had no seizures, she continued to experience moderate amounts of back pain, and her depression seemed to be well controlled. Dr. Hanson noted Plaintiff appeared "well." He diagnosed sinusitis, questionably controlled hypertension, obesity, chronic neck pain, and panic

disorder. He prescribed Avelox, continued Plaintiff on her previously prescribed medications, and advised her to lose weight. Dr. Hanson instructed Plaintiff to return in four months (R. 501).

On or about September 16, 2003, Dr. Hanson completed a Physician's Summary for West Virginia's Department of Health and Human Resources about Plaintiff, wherein he opined Plaintiff's chronic neck pain and panic and seizure disorders were expected to last for six months, she was unable to work around hazardous conditions, and her prognosis was "fair for recovery" (R. 500).

On October 13, 2003, Dr. Yurigan completed a Progress Report or Medical Necessity form of Plaintiff. Plaintiff's subjective complaints were neck and upper back pain and stiffness and arm pain, weakness and numbness. Dr. Yurigan's objective findings read as follows "MRI's of brain and cervical [spine]. See enclosed results"; no results were enclosed. Dr. Yurigan noted Plaintiff's current diagnosis was "chronic neck (cervical pain syndrome) with numbness stinging into arms to hands" and headaches. His plan of treatment was "conservative in nature"; he did not note in the report what his plan of treatment was. He opined Plaintiff's prognosis was poor in that she was not able to "maintain gainful employment for duration of life." Dr. Yurigan further found that Plaintiff was "in poor condition! No jobs. Not capable of gainful employment rest of life. Surgery not a [sic] option at this time!" (R. 493).

On November 6, 2003, Plaintiff reported to the family nurse practitioner at Health Care Center that she had experienced no seizures. Her hypertension was under "fair control." Plaintiff's cranial nerves were intact. She was prescribed Dilantin, Zestoretic, and Paxil (R. 524).

On November 15, 2003, Plaintiff complained of pelvic pain to Dr. Hanson (R. 501).

On November 17, 2003, Dr. Hanson wrote a note, addressed, "To Whom It May Concern," that Plaintiff was "incapable of working full time" (R. 499).

On January 20, 2004, Plaintiff phoned HealthWays and reported having anger outbursts and requested therapy (R. 486).

Plaintiff reported to a family nurse practitioner on January 22, 2004, that her depression had increased. Plaintiff stated she had experienced three "close losses within several months" and had no one "to talk to." Plaintiff stated she was "still able to work" in that she was "assisting handicap" (R. 523).

On February 3, 2004, Plaintiff reported to Dr. Hanson that she was "'miserable.'" She stated her panic disorder was not "much better" and that she had been undergoing therapy sessions at HealthWays, but she did not "think they [were] helping her." Plaintiff reported she regularly took her medication, slept only three hours nightly, cried daily, was not suicidal, experienced pelvic pain, and had a seizure three weeks earlier. Dr. Hanson increased her dose of Xanax (R. 502).

Plaintiff had a therapy session at HealthWays on February 4, 2004. She was fully oriented, alert, competent, and cooperative. She reported anxiety related to her medical condition. She was not suicidal or homicidal (R. 485).

On February 17, 2004, Plaintiff reported to therapy at HealthWays. She was oriented and alert; she was not suicidal or homicidal. She reported that, except for ovarian pain, her health had improved "a little" and she had been active with her hobby in handicraft (R. 484).

Plaintiff did not attend her therapy session on February 26, 2004, at HealthWays (R. 482).

On February 27, 2004, Plaintiff reported to a family nurse practitioner at Health Care Center that she had panic attacks, but for no "particular reason." She had had no seizures, was tearful, and had back pain due to constipation. The nurse practitioner noted Plaintiff's hypertension was well controlled and instructed Plaintiff to exercise (R. 522).

17

On March 26, 2004, Plaintiff reported to therapy at HealthWays. She was not suicidal or homicidal. She reported low back pain caused by ovarian cysts and that she had had a seizure the previous week, which had "set her back emotionally." Plaintiff reported her depression symptoms increased "a little." Plaintiff stated the relaxation techniques were helpful; the back pain was "very distracting at . . . time[s]" (R. 481).

A clinical supervisor's review of Plaintiff, completed at HealthWays on March 30, 2004, listed Plaintiff's diagnoses as depression disorder, NOS, alcohol dependence (Axis I); back pain (Axis III); divorced, no full time job due to medical issues and low income (Axis IV); and current GAF 60 and past year GAF 70 (Axis V) (R. 480).

Also on March 26, 2004, Plaintiff presented to Health Care Center and was treated by a family nurse practitioner. She reported she had experienced a seizure a week earlier. Her eye contact was fair and her dress was appropriate. She was prescribed Dilantin, Paxil, and Cyclobenzaprine (R. 521).

On April 6, 2004, Plaintiff attended a therapy session at HealthWays. She was fully alert, oriented, coherent, and cooperative. Her affect was "brighter." She reported she had sleep disturbances; she had a surgical consultation scheduled for a hysterectomy; she had not had any seizures; and she had found the therapy session "helpful" (R. 479).

On April 15, 2004, Plaintiff presented to her therapy session at HealthWays fully alert, oriented and able to "make needs known coherently." Plaintiff reported she had had no seizures, she was feeling better "overall," she had been reading the provided material, she had been sleeping six hours some nights, and she had been practicing the stress management techniques at bedtime, which "helped" and which caused her to be "improving" (R. 478).

On May 6, 2004, Plaintiff had a therapy session at HealthWays. She reported she was able to complete her activities of daily living with effort; she had not had any seizures; she experienced poor sleep; she was attempting to obtain Social Security benefits; and she had requested an evaluation by a psychiatrist (R. 477).

On May 12, 2004, Plaintiff presented to Health Care Center and reported she had experienced seizures since 1998, which were caused by head injuries sustained in an automobile accident (R. 520).

On May 15, 2004, Plaintiff reported to a family nurse practitioner at Health Care Center that her seizures were controlled; a biopsy of her uterus was negative; and she was doing "'ok'" (R. 519).

On May 20, 2004, Plaintiff presented to her therapy session at HealthWays alert, oriented, more calm, and more relaxed. Plaintiff stated she had been sleeping better and had been experiencing less anxiety. Plaintiff reported she had had two seizures the previous month, but that her seizure condition was under control. Plaintiff stated she was to have surgery on ovarian cysts (R. 476).

On June 11, 2004, Plaintiff "reported to session relative to her current need for information for SSI." Plaintiff reported pain from ovarian cysts. Plaintiff stated she had just returned from Florida, where she had visited her brother, who suffered with a severe heart problem. Plaintiff stated her mood was a seven on a scale of one to ten for depression (R. 476). She reported stress due to her brother's illness. Plaintiff stated she had not had any seizures, but had fainted five days earlier. Plaintiff reported some improvement of her psychiatric symptoms; her medical issues were not much improved as she would need gynecological surgery (R. 475).

On July 6, 2004, Michael T. Malayil, M.D., completed a psychiatric evaluation of Plaintiff at HealthWays. Dr. Malayil noted Plaintiff had been referred to HealthWays for treatment for her

"mood swings and depression, crying spells, etc." by her family doctor because "he didn't know what else to do for her." Plaintiff reported to Dr. Malayil that she had worked as a nurse in hospitals and nursing homes but "currently, she [was] doing some personal care in . . . homes." Plaintiff reported a history of seizure disorder, psychiatric problems, and hypertension. Plaintiff stated she medicated with Dilantin, Paxil, Risperdal, and Xanax. Plaintiff informed Dr. Malayil she smoked three cigarettes per day, did not consume alcohol, and she did not abuse any drugs (R. 473).

Dr. Malayil found Plaintiff was moderately obese; well oriented as to time, place, person; pressured speech with flights of ideas; no suicidal thoughts; no acute signs of depression; complaints of anxiety; fairly intact cognitive functions; good recent and remote memory; no psychosis; no auditory or visual hallucinations; some insight to her problems; and good judgment (R. 473-74). Dr. Malayil diagnosed the following: Axis I – rule out bipolar affective disorder; Axis II – no diagnosis; Axis III – history of seizure disorder and hypertension; Axis IV – chronicity of illness, limited support system, history of alcohol abuse in past; Axis V – GAF about sixty. Dr. Malayil advised Plaintiff to continue therapy at HealthWays and minimize her Xanax use. He prescribed Depakote 250mg to treat her mood swings and "act like an agent with her seizure medication" (R. 474).

Plaintiff reported, at her August 2, 2004, HealthWays therapy session, that she experienced anxiety about her medical condition, lack of insurance, and low income due to her inability to work without pain. Plaintiff stated she earns some income from crafts (R. 471). Plaintiff's motor activity, thought content, and memory were unremarkable. Plaintiff's abstract thinking was not impaired; her mood and affect were depressed; she was oriented times four; her intellect was average; her insight was fair; her judgment was appropriate; and her motivation was crisis oriented. Her depression

manifested itself in lethargy, fatigue, sleep disturbance, excessive worry, eating disturbance, panic attacks and inability to experience pleasure (R. 463-64).

On August 13, 2004, Plaintiff was treated by a family nurse practitioner at Health Care Center. Her nerve exam was negative. She was prescribed Dilantin (R. 518).

Plaintiff attended a therapy session at HealthWays on August 16, 2004; she failed to attend a therapy session on September 8, 2004 (R. 459-60).

On September 21, 2004, Carl R. Jones, D.O., upon referral by Dr. Hanson, examined Plaintiff for abdominal bloating. Plaintiff stated she experienced bloating, gas, indigestion, and heartburn. Plaintiff denied dysphagia, odynophagia, melena, or hematochezia. Plaintiff stated she had gained significant weight during the past two years. Plaintiff reported she medicated with Dilantin, Neurontin, Xanax, Paxil, Vicodin, Zestoretic, Flexeril, and Risperdal; she smoked one and one-half packages of cigarettes per day; she denied "meaningful alcohol use." Plaintiff weighed 232 pounds, her blood pressure was 128/82, her heart and lungs were clear (R. 487). Dr. Jones opined Plaintiff "describe[d] classic features of irritable bowel syndrome" and prescribed Robinul (R. 488).

On September 21, 2004, Plaintiff reported to Dr. Malayil that she was "getting some response from Neurontin"; she "like[d]" it; and it did not "bother" her stomach. Dr. Malayil recommended Plaintiff walk for exercise (R. 458).

Plaintiff canceled her October 26 and October 28, 2004, therapy sessions at HealthWays (R. 456-57).

At Plaintiff's November 16, 2004, appointment with Dr. Malayil, she reported back pain, which she treated with Vicodin, prescribed by her family doctor. Dr. Malayil "suggested . . . [Plaintiff] continue with her Neurontin to help her mood swings" (R. 455).

21

Plaintiff reported to a therapy session on December 13, 2004, the first session since August 16, 2004. Plaintiff reported continued back pain, which prevented her from working, and her failed attempts to be awarded Social Security benefits. Plaintiff and her therapist discussed potential steps for employment and how her nonattendance of therapy "suggest[ed] she [did] not favor it" or wanted to terminate it (R. 454).

Plaintiff canceled her January 12, 2005, therapy session at HealthWays (R. 453).

Plaintiff stated she did not "feel good" at her February 1, 2005, therapy session, but she reported interest and active involvement with others (R. 451).

On February 22, 2005, Plaintiff reported to Dr. Malayil she had tapered off Neurontin under the supervision of her primary care physician because of a skin rash. She was medicating with Risperdal, Paxil, and Dilantin. She reported her symptoms were in "fairly good remission" (R. 450).

Plaintiff failed to appear at her March 1, 2005, therapy session at HealthWays (R. 449).

Administrative Hearing

On March 9, 2005, Administrative Law Judge Hatfield conducted a hearing in Pittsburgh, Pennsylvania. Plaintiff testified she had gained seventy pounds in the past year. She stated she was "not doing anything" and could not "do anything for no longer, even at five, 10 minutes . . . " (R. 253). Plaintiff stated she "quit" her nursing job because she "wasn't feelin' good and . . . had had [her] first seizure back in '92" (R. 559-60). Plaintiff stated she had had eight grand mal seizures in the two or three years prior to the administrative hearing, but none in the previous five months (R. 564-65). Plaintiff testified after she quit her nursing job, she had gotten married and "didn't have to" work and "was sitting with [her husband's] grandfather and really didn't have to [work] . . . for about five years" (R. 559-60). Plaintiff stated she next work as a cleaner, performing light housework

22

for a "couple" of elderly people until about 2002, when she ceased that type of work due to her back pain (R. 560-61). Plaintiff stated she had been driving for the past two years (R. 556). She testified she had not driven for a period of five years prior to that due to her having had seizures, but once the seizures stabilized due to her controlling them with medication, she started driving again (R. 557). Plaintiff stated she drove almost sixty miles to the administrative hearing (R. 557-58).

Plaintiff stated her current monthly income was $100 from selling crafts. She sold leather purses and necklaces, which she made on special order during the winter. She sold her crafts at craft fairs in the summer (R. 555-56). Plaintiff testified she spent an hour every two or three days working on her crafts.

Plaintiff testified she experienced back pain. She stated she had experienced some improvement, but she had, during the past year and one half, become less "productive again." Plaintiff testified her upper back, lower back, daily headaches, inability to sleep, lower abdominal pain, abnormal vaginal bleeding, and intestinal problems prevented her from working (R. 562). Plaintiff stated she had been diagnosed with irritable bowel syndrome (R. 563). Plaintiff stated the pain, combined with her lack of sleep and the medication she took, which caused grogginess, would prevent her from working for eight hours a day, seven days per week (R. 563).

The ALJ asked Plaintiff the following question:

> If you had . . . a job where . . . the stress level wasn't that great. . . . [L]et's forget about your back . . . pain . . . but let's say, they said, . . . Ms. Campbell, . . . you've done cleaning work in the past and . . . you do work in . . . an office. Two or three floors. We don't care how long it takes you to do it. Just get it done . . . [.] [W]ould that be stressful for you do you think or is it more of if somebody told . . . you gotta' get this done every hour or something like that or is it both? (R. 568-69).

Plaintiff responded it would still be stressful. Plaintiff testified she would need to lie down because of back pain and headaches (R. 569). Plaintiff stated that, as the cleaner job was described

23

by the ALJ, she could not stand for more than ten minutes and she was "okay" with sitting, even though she experienced mild pain with sitting (R. 570). Plaintiff stated she had to rest twice when she walked three blocks (R. 571-72). Plaintiff stated she did not attempt to lift anything more than a gallon of milk (R. 573).

Plaintiff described her activities of daily living as follows: rose once or twice in the middle of the night to use the bathroom or treat her back pain by taking pain medication; returned to sleep; awoke between 6:00 a.m. and 8:00 a.m.; sometimes took pain medication for headache or back pain, which made her groggy, which caused her to return to bed for one to two hours; got out of bed to watch television; ate toast or oatmeal at 10:00 a.m. or 11:00 a.m.; loaded dishes in the dishwasher; did light dusting; fed the dog; attended church services once a week; received visits from her pastor once monthly; and shopped for groceries (R. 574-79).

The ALJ asked the VE the following hypothetical question:

> . . . [A]ssume that we have an individual the claimant's age, education and work experience. . . . Assume someone is limited to medium work as that's defined in the regulations. In addition, they would be limited to simple routine tasks and the work would not be involved with the public. That is interacting on a regular basis with the public. There'd be occasional interaction with co-workers that's up to one-third of a workday. Based on that hypothetical, could such a person do the RN job? . . . Basically, unskilled? (R. 586).

The VE responded Plaintiff could not perform her RN job, but she could perform the work of a hand picker, with a SVP of two, medium position, number of jobs in the local economy was 18,530 and number of jobs in the national economy was 942,000; fast food worker, with a SVP of two, light duty, number of jobs in the local economy was 79,500 and number of jobs in the national economy was 1,627,674 (R. 586).

The ALJ then asked the VE to consider the following: "[I]f I added to that that the person

would have to lie down during the day, now, we're talking about having to lie down at, in the workplace about an hour in the morning, an hour in the afternoon, unscheduled. So, you know, she might lie down at 9:00 a.m., might be 10:00 a.m., would that change your response?" The VE responded that the person "would not be able to perform the job duties and the responsibilities of the positions." He testified no job would accommodate those restrictions (R. 587).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920,  ALJ Hatfield made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 1997.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset date of disability.

3.    The claimant has the following severe impairments: a seizure disorder; and an anxiety disorder (20 CFR §§ 404.1521 and 416.921).

4.    The claimant does not have an impairment or combination of impairments that meets or equals an impairment listed in Appendix 1, Subpart P, Regulations No. 4.

5.    The claimant's allegations regarding symptoms and limitations are not entirely credible for the reasons set forth in the body of the decision.

6.    The claimant has the following residual functional capacity: She is able to perform the exertional demands of no more than medium work, or work which involves lifting and carrying of up to 50 pounds occasionally.  In addition, she must avoid all heights, hazards and dangerous or moving machinery.  Finally, she can perform only simple, routine tasks and can have no interaction with the public and only occasional interaction with co-workers.

7.    The claimant is unable to perform past relevant work (20 CFR §§ 404.1565 and 416.965).

8.    The claimant is a younger individual age 18-44 (20 CFR §§ 404.1563 and 416.963).

9.    The claimant has a high school education (20 CFR §§ 404.1564 and 416.964).

10. The claimant has not acquired work skills that are transferable to other occupations within the residual functional capacity defined above (20 CFR §§ 404.1568 and 416.968).

11. Although the claimant's additional limitations do not allow the claimant to perform the full range of medium work, considering the claimant's age, education and work experience, there are a significant number of jobs in the national economy that the claimant could perform. Thus, a finding of "not disabled" is appropriate under the framework of Medical-Vocational Rule 203.29.

12. The claimant has not been under a "disability" at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)) (R. 28).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.      The ALJ erred in failing to credit the opinions of Dr. Hanson under the treating physician rule and the decision is contrary to the substantial evidence of record.

Commissioner contends:

1.      "Plaintiff is mistaken" in her contention that the ALJ improperly evaluated the medical "opinion" of Dr. Hanson, who had diagnosed her with chronic neck and back pain and cervical radiculopathy [Defendant's brief at p. 7].

## C. Treating Physician

Plaintiff argues the ALJ erred in failing to credit the opinions of Plaintiff's treating physician under the treating physician rule and the decision is contrary to the substantial evidence of record.

Defendant asserts Plaintiff is mistaken in this argument.

The treating physician rule to which Plaintiff refers and under which, Plaintiff argues, Dr. Hanson's opinions should have been given "credit" (Plaintiff's brief at p. 7) is as follows:

d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §416.927(d)(1)(2).

As to Plaintiff's treating physician, Dr. Hanson, the ALJ found the following in his decision:[3]

I am aware that the claimant's general treating physician, Dr. Hanson, wrote a brief note in November 2003 stating that the claimant was "incapable of working full time. (Exhibit 27F). I give very little weight to these statements by Dr. Hanson (R. 25).

Statements that a claimant is "disabled", [sic] "unable to work", [sic] can or cannot perform a past job, meets a listing or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are outside the scope and expertise of a medical source, and they are reserved to the Commissioner, who cannot abdicate the statutory responsibility to determine the ultimate issue of disability (SSR 96-5P). Therefore, I give no special significance to Dr. Hanson's statement that the claimant's condition is "disabling" (R. 25).

However, the Social Security Regulations and Social Security Rulings 96-2p provide that I must consider the opinions of all physicians of record and that controlling weight must be given to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and the opinion is not inconsistent with the other substantial medical and nonmedical evidence in the case record (R. 25).

Although Dr. Hanson has been the claimant's primary general treating physician, he has not provided laboratory or clinical findings to support his generic statements. In fact, Dr. Hanson's treatment records completely contradict any assessment of disability. Dr. Hanson's records indicate on several occasions that the claimant "appeared well" and was "doing ok" (Exhibit 27F). Dr. Hanson has noted some . . . irregular complaints of neck and back pain, but he has not pursued a form of treatment which would indicate severe pain . . . such that the claimant would be disabled (Exhibit 27F). Moreover, credible evidence of record indicates that the claimant is highly functional with regard to physical activities. She testified as to a full range of daily activities; she has previously reported an ability to occasionally go hunting; and Dr. Wilson's examination showed no physical limitations whatsoever (Exhibit 14F). I find that the majority of credible evidence of record supports my residual functional capacity assessment and refutes Dr. Hanson's generic assessment

---

[3]Plaintiff does not argue that the ALJ erred in his assessment of Dr. Hanson's opinions of Plaintiff's panic disorder but in his assessment of Dr. Hanson's opinions of Plaintiff's cervical radiculopathy and chronic neck and back pain (*See* Plaintiff's brief pp. 5-9). This Court will, therefore, limit ruling to the issue addressed in Plaintiff's argument.

of disability (R. 25-26).

. . .

> Overall, the evidence of record indicates at least an ability to perform simple, routine tasks. . . . [T]he claimant's complaints of neck and back pain, although not substantiated by any scientific evidence, have been accounted for a limitation to medium work, given the fact that Dr. Hanson's treatment notes do diagnose chronic neck and back pain (Exhibit 27F). Thus, my residual functional capacity assessment is fully supported by the majority of evidence of record (R. 26).

Dr. Hanson was Plaintiff's treating Physician; he treated her periodically for a number of years. The ALJ was correct in his decision that Dr. Hanson's opinion relative to Plaintiff's disability is an issue reserved to the Commissioner. 20 C.F.R. §404.1527(3)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Additionally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §4041527(e)(1). Such opinions of Dr. Hanson cannot, therefore, be accorded controlling weight or even any special significance.

The medical opinions of Dr. Hanson were evaluated by the ALJ, and his decision to assign "very little weight" to those opinions is supported by substantial evidence of record (R. 25). In _Craig v. Chater_, 76 F.3d 585, 590 (1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." _Hunter v. Sullivan_, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded

significantly less weight.

In his decision, the ALJ found the opinions of Dr. Hanson were "generic," were contradictory and were not supported by laboratory or clinical findings (R. 25). A review of the record supports the ALJ's findings regarding Dr. Hanson's opinions.

On August 31, 1998, Dr. Hanson found no tenderness in Plaintiff's neck (R. 219). On November 19, 1998, Dr. Hanson noted Plaintiff was doing "quite a bit better with less pain in her neck" (R. 218-19). On March 15, 2000, Dr. Hanson's treatment note read that his examination of Plaintiff was normal and that she stated she was feeling "the best that she ha[d] felt . . ." (R. 401). On January 19, 2003, Dr. Hanson examined Plaintiff; found she appeared "well"; and diagnosed chronic neck pain (R. 24-26, 498). On February 16, 2003, Dr. Hanson examined Plaintiff; found she appeared "well"; and diagnosed chronic neck pain (R. 24-26, 498). On March 4, 2003, upon examination by Dr. Hanson, Plaintiff had good reflexes in her arms and she had no muscle atrophy or weakness (R. 24-26, 401). July 16, 2003, Dr. Hanson found Plaintiff appeared "well"; he noted she continued to experience "moderate" amounts of back pain; he diagnosed chronic back pain; he continued Plaintiff on her prescribed medications; he advised her to lose weight; and he instructed her to return to his care in four months (R. 24-26, 501). On September 16, 2003, Dr. Hanson completed a West Virginia Department of Health and Human Resources Physician's Summary, noting thereon that Plaintiff had chronic neck pain and making a prognosis that her recovery was "fair" (R. 24-26, 500). On February 3, 2004, Dr. Hanson did not examine or treat Plaintiff for back or neck pain. These treatment notes of Dr. Hanson do not contain any exertional limitations based on Plaintiff's chronic back or neck pain. They are neither conclusive nor persuasive. They are, as the ALJ wrote, "generic."

Additionally, the ALJ based his diagnoses and his opinions as to Plaintiff's condition on Plaintiff's statements, not on clinical or laboratory findings. On January 19, 2003, Dr. Hanson found Plaintiff was partially disabled because she stated she had "tried to do several jobs which were relatively easy physically but could not do them because of back & neck pain" (R. 24-26, 498). On February 16, 2003, Dr. Hanson diagnosed chronic neck pain based on Plaintiff's statement that "she still [had] . . . neck pain" (R. 24-26, 498). On March 4, 2003, Plaintiff informed Dr. Hanson that she had experienced long-time radicular symptoms with her left arm. Dr. Hanson diagnosed cervical radiculopathy (R. 401). On November 17, 2003, Dr. Hanson wrote a note, addressed "To Whom It May Concern," that Plaintiff was "incapable of working full time" (R. 24-26, 499). Dr. Hanson did not rely on the results of any clinical or laboratory testing to make these findings relative to Plaintiff's neck and back pain.[4]

There is substantial clinical and laboratory testing evidence of record to support the ALJ's decision. On January 28, 1999, Plaintiff underwent a nerve conduction study and an electromyogram (R. 240). The results were for normal studies in upper limbs. There was "no evidence of median or ulnar nerve entrapment" (R. 241). The March 17, 2003, a cervical x-ray of Plaintiff's neck showed encroachment of the C4-5 posterior foramina (right) and spurring and encroachment of the C6-7 foramina (left), but no compression. Also on March 17, 2003, a MRI of Plaintiff's cervical

---

[4]On March 17, 2003, Plaintiff had a x-ray made of her neck. It revealed encroachment of the C4-5 posterior foramina in the right oblique view and spurring and encroachment of the C6-7 foramina in the left, but to a slightly lesser degree. The rest of the foramina were intact and the vertebral bodies showed no compression (R. 24, 405). Also on March 17, 2003, a MRI was taken of Plaintiff's cervical spine. It showed right neural foraminal narrowing at C3-4, bilateral neural foraminal narrowing at C6-7 and no disc protrusion (R. 24, 406). Dr. Hanson ordered these tests; however, the record does not contain any evidence that he reviewed them with Plaintiff; he relied on them to make diagnoses; or he used them to assign exertional limitations to Plaintiff based on them.

spine showed right neural foraminal narrowing at C3-4 and bilateral neural foraminal narrowing at C6-7. There was disc desiccation at C2-3, C3-4, and C5-6; however there were no disc protrusions and no paraspinal tissue abnormalities and the marrow signal intensity was normal (R. 24, 405, 407).

In addition to Dr. Hanson not assigning exertional limitations based on Plaintiff's chronic neck and back pain and Dr. Hanson relying on Plaintiff's statements and not on any clinical or laboratory findings to support his diagnosis of chronic neck and back pain, Dr. Hanson did not offer any treatment to Plaintiff for her complained of neck and back pain. He prescribed pain medication, but he did not recommend Plaintiff undergo physical therapy or consult with a specialist for treatment of her symptoms (R. 25-26).

The ALJ's decision to assign "very little weight" to Dr. Hanson's "generic" opinions is supported by substantial evidence of record in that Dr. Hanson's statements about Plaintiff's back and neck conditions are contradictory to the opinions of other doctors. The ALJ considered Dr. Wilson's October 11, 2002, findings that Plaintiff "showed normal strength and motor capability throughout, with normal reflexes as well" (R. 23). The ALJ also relied on Dr. Wilson's[5] findings that Plaintiff's strength was 5/5 in all extremities; she had no tenderness over her cervical or lumbar spines; and her ranges of motion were "completely" normal in both her cervical and lumbar spines. The ALJ considered and discussed Dr. Wilson's findings that Plaintiff's straight leg raising test was negative; she could walk on her toes; she could perform a full squat. The ALJ discussed Dr. Wilson's finding that Plaintiff's neurological examination was normal (R. 24). Additionally, the

---

[5]In one section of his decision (R. 24), the ALJ referred to Dr. Wilson as "Dr. Golas[]" during his discussion and consideration of the opinions and findings of Dr. Wilson, who completed a Disability Determination Evaluation of Plaintiff on October 11, 2002. The Court finds this is harmless error.

record of evidence contains Dr. Wilson's finding that Plaintiff could sit, stand, and walk without any limitations. She had good use of her hands and could handle objects (R. 363). Plaintiff's neck and extremity examinations were normal (R. 362). Dr. Wilson diagnosed neck and upper back muscle spasm with no radiculopathy (R. 362). The ALJ relied on the Dr. Wilson's "credible evidence of record" that indicated Plaintiff had "no physical limitations whatsoever" relative to her back and neck (R. 26).

Plaintiff asserts that Dr. Wilson's opinions were "somewhat at odds with Dr. Hanson's" and were "the only contrary evidence in the entire record" (Plaintiff's brief at p. 8). This statement is without merit. Dr. Hanson's opinions were also contradictory to the following opinions:

- Dr. Franyutti, a state agency physician, found, on February 9, 1999, Plaintiff could occasionally lift and/or carry up to fifty pounds; could frequently lift/carry up to twenty-five pounds; could stand/walk/sit for six hours in an eight-hour work day; could push/pull unlimited; could frequently climb, balance, stoop, kneel, crouch, and crawl; and had no manipulative, visual, or communicative limitations. Dr. Franyutti found there was "no objective evidence supporting disability" (R. 243-47).

- Dr. Sanders found Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations for her date last insured, which was December 31, 1997 (R. 392-96).

- On February 21, 2003, Dr. Brown, a state agency physician, reviewed and affirmed the findings of Dr. Sanders (R. 391, 399).

- Dr. Malik found Plaintiff's proximal and distal muscle mass, tone, and strength were normal in her upper extremities on September 23, 1999 (R. 490).

- Dr. Yurigan diagnosed cervical pain syndrome, but no radiculopathy, for which he recommended a conservative treatment plan (R. 493).

Additionally, the ALJ relied on a state agency physician in determining Plaintiff's RFC. On October 16, 2002, Dr. Sanders found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hour in an eight-hour

33

workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 385). Dr. Sanders found Plaintiff had no postural, manipulative, visual, or communicative limitations (R. 386-88). Plaintiff was unlimited in her exposure to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation, but should avoid even moderate exposure to hazards (R. 388). Plaintiff's RFC was reduced to medium. The ALJ agreed with the "assessment made by the Sate non-examining physician . . . that the claimant is limited to performing the exertional demands of medium work" (R. 24). "State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether" a person is disabled. See 20 CFR § 404.1527(f)(2)(i). The ALJ found that the evidence provided by the state agency physician, as well as that provided by Dr. Wilson, constituted the "majority of credible evidence of record," which "support[ed] [his] residual functional capacity assessment and refute[d] Dr. Hanson's generic assessment of disability" (R. 26). This finding is substantially supported.

Finally, the ALJ found that Plaintiff's own testimony that she could perform a full range of daily activities was contrary to Dr. Hanson's opinion; Plaintiff contends this finding was in error because it was inconsistent with Plaintiff's testimony at the administrative hearing (R. 26). The ALJ referred to Plaintiff's testimony in his decision when he described her activities of daily living;

however, he also relied on and referred to a Daily Activities Questionnaire in his decision.[6] Based on a combination of Plaintiff's testimony and the Daily Activities Questionnaire submitted to the ALJ at the administrative hearing, the ALJ found that Dr. Hanson's opinions were contradictory to the "full range of daily activities" Plaintiff stated she could perform (R. 26). This finding is supported by substantial evidence of record.

The ALJ found, based on Plaintiff's testimony and information provided at the administrative hearing in the form of the Daily Activities Questionnaire, that Plaintiff attended church weekly, handled personal paperwork, took telephone messages, washed dishes, and attended to all her personal needs. The ALJ also considered evidence submitted by Plaintiff at the day of the hearing that she "made sure people hired for work on property [got] it done"; cared for her dog; cared for her landlord by administering medications and breathing treatments; listened to the radio as she worked on crafts; watched game shows and movies; visited family out of town four times yearly; visited with her landlord daily; and visited with friends twice per week (R. 24, 183-88). These activities confirmed Plaintiff was, as the ALJ found, "highly functional" and represent a "full range of daily activities" (R. 26).

The ALJ also found Plaintiff drove regularly without difficulty and that she drove fifty miles to the hearing, shopped, cooked, and made crafts daily (R. 23). Plaintiff contends these findings are inconsistent with her testimony. Plaintiff argues in her brief that she could drive if she were able; cooked on some days; shopped one hour per week, and worked on crafts one hour every two to three days (Plaintiff's brief at pp. 8-9). Plaintiff testified she had been driving regularly for the past two

_____

[6]The Daily Activities Questionnaire was submitted to the ALJ at the administrative hearing and was marked as Exhibit 13E. Subsequent to the hearing, the exhibit was renumbered as 22E; however, the ALJ referred to it in his decision as it was originally marked – Exhibit 13E.

years when she was "feeling good" and she had driven fifty to sixty miles to the hearing that date. In the Daily Activities Questionnaire, which was received during the hearing and considered by the ALJ, Plaintiff wrote she drove two hundred miles per month to doctors' appointments, to shop, and to take a friend to appointments (R. 187, 557). The ALJ's finding that Plaintiff is "able to drive with no difficulty . . . in spite of alleged pain" is based on Plaintiff's testimony and the information submitted to the ALJ in the Daily Activities Questionnaire and is supported by substantial evidence (R. 23). At the administrative hearing, Plaintiff testified she shopped for groceries (R. 578-79). In the Daily Activities Questionnaire, Plaintiff wrote she shopped every two weeks (R. 184). The ALJ's finding that Plaintiff was "able to get about shopping" is supported by substantial evidence of record (R. 23). Plaintiff testified she ate toast or oatmeal at 10:00 a.m. or 11:00 a.m. (R. 574-79). In the Daily Activities Questionnaire, which she provided the ALJ at the administrative hearing, Plaintiff wrote she ate cold meals and cooked one meal daily, which included bacon and eggs, Hamburger Helper, pot pies, or hamburgers (R. 185). The ALJ's finding that Plaintiff's activities of daily living including cooking is supported by substantial evidence (R. 23). Plaintiff testified she worked on her leather crafts one hour every two to three days (R. 556). The ALJ's finding that Plaintiff worked on her leather crafts on a daily basis is based on a response found in the Daily Activities Questionnaire, which was considered and relied upon by the ALJ, wherein Plaintiff wrote "crafts" was an activity that she worked on "one to two hours in a day." The ALJ's finding, therefore, that Plaintiff worked on crafts daily is supported by substantial evidence (R. 23, 24, 25, 188). The ALJ's finding that Plaintiff "acknowledged an ability to perform a full range of daily activities" is supported by substantial evidence of record (R.24). Plaintiff's own statements about her activities of daily living were contradictory to the opinions of Dr. Hanson.

For the above stated reasons, the undersigned finds the ALJ's decision relative to the opinions of Dr. Hanson is supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _25_ day of _April_, 2008.

_____

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE